BODE, Respondent, vs. SCHMOLDT and others, Appellants.

*March 15—April 11, 1922.*

*Malicious prosecution: Application in insanity proceedings: Find-ing of insanity by physicians making inquisition: Conclusive determination as to·probable cause.*

1. Under the statutory procedure in insanity, by which, on the filing of a petition, two physicians are appointed to examine the person believed to be insane and to report their conclu-sions to the court, following which a jury trial may be had, a *bona fide* professional determination by such physicians of insanity is conclusive evidence that probable cause existed negativing liability as for malicious prosecution of the signers of the petition.
2. Under sub. (4), sec. 51.01, Stats., providing that the report of the physicians shall be based on personal examination and inquiry, the fact that the physicians interviewed the neigh-bors of the person examined is no reason for denying to their report its conclusive character as to probable cause for the institution of the proceedings, there being no evidence that they were fraudulently misled by any acts of the petitioners for the inquisition.

DOERFLER and ESCHWEILER, JJ., dissent.

APPEAL from a judgment of the circuit court for Dodge county: MARTIN L. LUECK, Circuit Judge. *Reversed.*

Malicious prosecution. Plaintiff and defendant *Gustav Schmoldt* are neighbors in the city of Watertown, residing on adjoining lots. Plaintiff is a spinster, and resides with and keeps house for her brother. She is fifty-one years of age. The defendant *Gustav Schmoldt* has a wife and sev-eral small children. For a number of years the relations between the plaintiff and the family of the defendant *Gus-tav* have not been cordial. The *Schmoldt* children have been an annoyance to the plaintiff. She had been severe in her manner towards the children and a number of quarrels have taken place between the two families. There were some noticeable peculiarities about plaintiff's disposition. She had frequent fits of passion and at times demeaned herself in a boisterous manner. She was at one time ar-

rested on complaint of another neighbor for using abusive and obscene language. When the chief of police served the warrant on her she refused to be taken out of the house, defied the chief, and indulged in abusive and obscene language. The chief refrained from taking her into custody, and her brother appeared and paid her fine. She entertained, and upon numerous occasions gave expression to, irrational religious views, and claimed divine protection.

In June, 1920, Mrs. Schmoldt complained to her husband, the defendant *Gustav,* concerning the continuous trouble with plaintiff and told him that something had to be done. Her husband interviewed the chief of police, who expressed the opinion that the plaintiff was not right. Her husband then went to see an attorney, told him in a general way of the conduct of the plaintiff and what the chief of police had said. The attorney advised him to have her examined as to her sanity; whereupon he procured a blank petition for an inquisition and induced the defendant *Lelia Wenker* and his father, *Fred Schmoldt,* to sign the petition with him.

The county judge appointed two physicians to make an examination under the provisions of ch. 51 of the Statutes, and they reported her to be insane. Their report indicates that they interviewed the neighbors, and that their conclusion was based in part at least upon information thus derived. The report disclosed that they notified the patient that an application had been made for an examination into her mental condition, and in response to question 35 of the statutory blank, "Does the patient desire a hearing in person?" they answered, "states that no one can make her appear for hearing."

Upon this report of the physicians the county judge adjudged her insane, issued a commitment and delivered it to the sheriff, who took plaintiff in custody, kept her at his farm home that night, and the next day delivered her at the Northern Hospital for the Insane. She was never taken before the court nor accorded an opportunity to be heard.

Shortly after her commitment to the Northern Hospital for the Insane she was transferred to the county asylum for Dodge county. Upon a re-examination she was adjudged sane by a jury on the 18th day of August. The first application for an examination into her sanity, signed by the defendants, was dated July 10th. The warrant to the examining physicians was dated July 13th. Their report was dated. July 30th and her commitment was dated August 3d. Thereafter this action was brought to recover damages for the alleged malicious prosecution.

The case was tried before a jury. A general verdict was returned in favor of the plaintiff, upon which judgment was rendered against the defendants. This is an appeal from said judgment.

For the appellants there were briefs by *Edward F. Wieman* and *Kading & Kading,* all of Watertown, and oral argument by *Elizabeth Kading* and *Charles A. Kading.*

For the respondent the cause was submitted on the brief of *Otto Kuenzli* of Watertown.

OWEN, J. The action was defended on the ground, first, that there was no evidence to show malice; second, that there was probable cause to believe the plaintiff insane; third, that defendant acted upon the advice of counsel; and fourth, that the result of the proceeding was an adjudication that the plaintiff was insane. The establishment of any one of these defenses precludes a recovery. For reasons to appear hereinafter it must be held upon this record as a matter of law that there was probable cause to believe the plaintiff insane, which obviates the necessity of considering whether the other defenses were established.

The procedure in the nature of lunacy proceedings prescribed by statute may be briefly summarized as follows: Whenever any person is believed to be insane, application may be made by three citizens to the judge of the county court for a judicial inquiry as to his mental condition. Upon

receipt of such application the judge shall appoint two dis-
interested physicians to examine the person believed to be
insane; said physicians shall by personal examination of
such person, and inquiry, satisfy themselves as to such per-
son's mental condition and report the result of their exami-
nation to said judge. It is required that said physicians,
before making such examination, give notice to the person
to be examined that application has been made for inquiry
into his mental condition, withholding the names of the ap-
plicants if they deem it wise, and that he can be heard in
respect to the same, and if in their judgment such notice
would be injurious to such person, or of no advantage to
him, they may withhold such notice, and,shall set forth at
length their reasons for so doing in their report. If it ap-
pears from the report of the examining physicians that the
notice was not given, the judge may appoint a time and
place for hearing the application and shall cause notice
thereof to be served upon the alleged insane person in the
manner a summons is required to be served, which notice
shall state that application has been made for an examination
into his mental condition, and that such application will be
heard at the time and place named in such notice, but if it
shall be made to appear to the satisfaction of said judge by
the report of said physicians or otherwise that such hear-
ing and the service of such notice would be injurious or
without advantage to such alleged insane person by reason
of his mental condition, such service of notice may be
omitted. If such notice be ordered and served, and a jury
trial be not awarded, the judge may proceed at the time and
place specified in such notice, or if such notice be not ordered
then upon the report of the physicians, summarily to make
such further examination as may seem to him to be neces-
sary and proper, and if he be satisfied by all the evidence
adduced that such person is insane, he may order him to
be committed. It is also provided that the judge may, if
he thinks the best interest of the alleged insane person re-

quires it, appoint a guardian *ad litem* for such person at any stage of the proceedings.

It will be observed that the original application does no more than call the attention of the county judge to the fact that a person is believed to be insane; that application results in nothing more than the appointment of physicians to examine into the sanity of the suspected individual. If the physicians report the subject to be sane, the proceedings are ended. The suspected person is not arrested, he is not detained, his liberty is in no manner interfered with. Were it not for the fact that such a proceeding is regarded as a proper basis for an action for malicious prosecution in *Manz v. Klippel,* 158 Wis. 557, 149 N. W. 375, we should be disposed to give serious consideration to the question whether the mere application for a judicial inquiry into the mental condition of an insane person affords a basis for an action for malicious prosecution. However, no doubt seemed to have been entertained as to the propriety of such an action in *Manz v. Klippel, supra,* and it may as well be regarded as the settled law of the state. It is true that to falsely question one's sanity is no light or trifling matter. It may result in serious consequence and damage. Its natural tendency is to injure one's social standing and credit and to bring humiliation to the one whose sanity is brought in question. Where this is done maliciously and without probable cause, it is a wrong for which the law should afford a remedy, and perhaps the action of malicious prosecution is as well adapted to afford that remedy as any other action known to the law. It has been held that malicious prosecution will lie under such circumstances in *Kellogg v. Cochran,* 87 Cal. 192, 25 Pac. 677; *Lockenour v. Sides,* 57 Ind. 360; and in *Ulven v. Stormo,* 43 S. Dak. 513, 180 N. W. 964, although in the latter case the insanity proceedings were instituted by the service of a warrant. See, also, 1 Cooley, Torts (3d ed.) 348.

The physicians appointed in response to defendants' appli-

cation found that the plaintiff was insane. Should the ordinary layman be held to respond in damages for instituting an inquiry into one's sanity because there was no reasonable ground to justify the belief of insanity, when two reputable physicians appointed by the court, constituting the agency provided by law for the ascertainment of one's mental condition, determine that the suspect is in fact insane? There would seem to be an incongruity in such a rule. It would make the institution of such proceedings a hazardous undertaking and would tend to restrain the initiation of such proceedings on the part of the citizen which the welfare of society often demands should be instituted. If the advice of an attorney in the ordinary civil or criminal prosecution is conclusive evidence of the existence of reasonable cause, why should not the finding of physicians appointed in insanity proceedings to ascertain his mental condition, that the subject is insane, conclusively establish the existence of reasonable cause for the institution of the proceedings. Physicians so appointed are the agency created by law for the ascertainment of the mental condition of the alleged *non compos*. When they have found the subject insane, why should the existence of reasonable cause to believe him insane be longer an open question? The law regards it as a closed question so far as the future course of the proceedings is concerned. If the physicians find the subject sane, that ends the proceedings; if insane, there is a further inquiry. If this finding justifies a further judicial inquiry, why should it not also be held to have justified the filing of the petition, and why should those filing the petition be held responsible for the consequences of the further proceedings?

We hold that where physicians appointed by the court to inquire into the sanity of a suspected *non compos* find and report him to be insane, such finding constitutes conclusive evidence of the existence of reasonable grounds justifying the filing of the application and the institution of the in-

quiry, unless the finding can be impeached for fraud or bad faith on the part of the physicians, or for collusion with the petitioners, or other conduct which deprives their conclusion of the character of a *bona fide* professional determination. We discover no evidence in the record of any fraud or bad faith on the part of the physicians, or of collusion between them and the petitioners, or any other conduct which should deprive their conclusion of the character of a *bona fide* professional determination. It is true that they interviewed the neighbors, and it is possible that their conclusion was based in part upon the result of such interview. But the statute expressly enjoins them to satisfy themselves as to his mental condition by personal examination of such person *and inquiry*. Sub. (4), sec. 51.01, Stats. There is no evidence that they were misled by any of the defendants in this case, if they were misled at all, and we see no reason for denying to the report the conclusive effect which we hold should be ascribed to a *bona fide* professional determination upon the question of the suspected person's mental condition. It follows that the existence of reasonable cause to believe the person insane justifying the defendants in filing the petition appears as a matter of law, and that the action cannot be maintained.

*By the Court.*—Judgment reversed, and cause remanded with instructions to dismiss plaintiff's complaint.

The following opinions were filed May 18, 1922:

DOERFLER, J. (*dissenting*). By the majority decision in this case a new doctrine has been established in malicious prosecution cases. Under this doctrine, regardless of the animus of the instigators of the proceeding, if the medical appointees in their report find the unfortunate victim insane, then the injured party has no recourse whatever.

Under the law as it has universally heretofore been held, the advice of counsel is deemed a defense in cases of this

kind, provided a full and fair statement of the subject matter is made to him and if the party in good faith acts upon such advice.   The reason for such rule is apparent.   An attorney at law is a *quasi*-judicial officer of the court, with a primary obligation to aid in the administration of justice. An investigation by such an officer is in the nature of a judicial investigation, and the conclusions arrived at by him have an effect similar to the final adjudication of a court having jurisdiction in the matter.   The reliance in law placed upon an attorney in a matter of this kind is a proper tribute to the dignity and importance of the office of an attorney.   This is the basic view, which has resulted in constituting, in a proper case, the advice of counsel as a defense in malicious prosecution cases.   This is an avenue that any one desiring to instigate an investigation like the one involved in this case can always readily resort to, and he can thereby gain immunity if he acts honestly and in good faith.

The object of the statute requiring the appointment of two physicians is manifest.   Such object is intimated in the majority opinion of the court.   The report of the physicians is merely advisory.   Where the report is of such a nature that it appears therefrom that the person charged with insanity is either violent or dangerous, or is so deficient in his mentality as to be utterly unable to appreciate judicial proceedings, then the court, acting upon such advice, pursuant to the statute, can commit without even notice of the proceedings to the one charged.   The theory of the statute is based upon the idea that where no judicial investigation is made, a situation must exist where such investigation would be a mere idle ceremony, and the commitment is not only intended for the benefit of the one charged but for his immediate relatives and for the safety of the community in general.   Such a proceeding, under circumstances as above detailed, can only be justified upon the theory that the commitment is an exercise of the power not only for the benefit of the public but for the benefit of the person charged.

In the instant case, under proper instructions, the jury found by its verdict all of the issues in the case in plaintiff's favor, also malice, lack of probable cause, and failure to make a full and complete statement in good faith to counsel. Even the finding of an examining magistrate in a criminal case of probable cause does not constitute a conclusive presumption of the existence of such probable cause. And such finding does not absolutely shield the accuser from the charge of malicious prosecution. At most the report of the physicians is merely evidentiary, and the same does not partake of the dignity either of a judicial inquiry or of a finding of probable cause.

It would be a waste of time and effort to detail herein the aggravating circumstances involved in the acts of the defendants in an effort to secure plaintiff's confinement in an insane asylum. The charge of insanity, while differing from that of a criminal charge, is nevertheless humiliating and degrading. Even a strong suspicion of insanity is liable to leave its marks not only upon the innocent victim but upon her descendants. It affects the possibility of entering the marital relation; it is an obstacle to obtaining life insurance; it prevents the obtaining of a position under the civil service rules and regulations; it has a tendency to exclude from social intercourse; and is so serious in every aspect that words can barely adequately describe it.

It is said in the majority opinion that if the reports of the physicians are favorable the proceedings come to an end. Nevertheless such proceedings become matters of public record, and while under the opinion of the majority no liability can exist, nevertheless the stigma is almost as great as though the report be adverse to the one examined. On no question arising in the courts in civil and criminal cases do greater contradictions and disputes appear than in the testimony of experts on insanity. The good faith of the physicians may act as a shield to them, but it is impos-

sible for the writer to see how it can shield one who wrong-fully instigates the proceedings from malice, having in view as its end the confinement of a human being in an insane asylum. The most that can be made of the reports of physicians is to establish presumptive good faith, which presumption ought to be rebuttable.

ESCHWEILER, J. I concur in the foregoing dissenting opinion by Mr. Justice DOERFLER. To me there is a substantial distinction between the situation in cases like the present and one where the advice of the physicians is not sought or obtained until after the proceedings have been instituted, the machinery set in motion, and much, if not all, of the harm done, and that in the other class of cases for malicious prosecution where the advice of counsel is sought and given before the complaint is sworn to or the warrant issued.